Michael A. Josephson*
TX Bar No. 24014780
Andrew W. Dunlap*
TX Bar No. 24078444
Alyssa J. White (admitted pro hac vice)
TX Bar No. 24073014
**JOSEPHSON DUNLAP LLP**
5847 San Felipe St., Suite 2400
Houston, Texas 77057
Tel: (713) 352-1100; Fax: (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com
awhite@mybackwages.com

Richard J. (Rex) Burch*
TX Bar No. 24001807
**BRUCKNER BURCH PLLC**
5847 San Felipe St., Suite 2400
Houston, Texas 77057
Tel: (713) 877-8788
rburch@brucknerburch.com

*Pro hac vice applications forthcoming*

*Attorneys for Nastrom and the Hourly Employees*

April L. Hollingsworth
UT Bar No. 09391
**HOLLINGSWORTH LAW OFFICE, LLC**
40 South 600 East
Salt Lake City, Utah 84102
Tel: (801) 415-9909; Fax: (801) 303-7324
april@aprilhollingsworthlaw.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

## SOUTHERN DIVISION

| | |
|---|---|
| **CHRISTOPHER NASTROM, Individually and for Others Similarly Situated**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BRONCO UTAH OPERATIONS, LLC and WOLVERINE FUELS, LLC,**<br><br>**Defendants.** | **FIRST AMENDED COLLECTIVE ACTION COMPLAINT**<br><br>JURY DEMANDED<br><br>FLSA Collective Action<br><br>**Case No. 2:26-cv-00149** |

## FIRST AMENDED COLLECTIVE ACTION COMPLAINT

### SUMMARY

1. Christopher Nastrom (Nastrom) brings this amended collective action to recover unpaid wages and other damages from Bronco Utah Operations, LLC (Bronco) and Wolverine Fuels, LLC (Wolverine) (collectively, Defendants).

2. Bronco employed Nastrom as one of its Hourly Employees (defined below).

3. Nastrom and the other Hourly Employees regularly work more than 40 hours in a workweek.

4. Bronco pays Nastrom and the other Hourly Employees by the hour.

5. However, Bronco does not pay Nastrom and the other Hourly Employees for all hours worked, including overtime hours.

6. Rather, Bronco requires Nastrom and the other Hourly Employees to prepare and put on protective clothing and safety gear fundamentally necessary to and intertwined with their job duties, while on Bronco's premises, "off the clock."

7. Likewise, Bronco requires Nastrom and the other Hourly Employees to change out of and store their safety gear and protective clothing and wash up, while on Bronco's premises, "off the clock." (¶¶ 6-7 together, Bronco's "pre/post shift off the clock policy").

8. Bronco does not pay Nastrom and the other Hourly Employees for the time they spend donning and doffing their safety gear and protective clothing "off the clock," before and after their shifts.

9. Additionally, Bronco automatically rounds Nastrom's and the other Hourly Employees' clock in and clock out times to the nearest quarter hour for its own primary benefit and to the detriment of these employees (Bronco's "rounding policy").

10. Additionally, Bronco pays Nastrom and the other Hourly Employees non-discretionary bonuses, including safety bonuses, that Bronco excludes from their regular rates of pay for overtime purposes (Bronco's "bonus pay scheme").

2

11.     Bronco's pre/post shift off the clock policy, rounding policy, and bonus pay scheme violate the Fair Labor Standards Act (FLSA) by failing to compensate Nastrom and the other Hourly Employees at rates of at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 in a workweek.

## JURISDICTION & VENUE

12.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

13.     This Court has personal jurisdiction over Bronco because it maintains its principal place of business in Utah.

14.     This Court also has personal jurisdiction over Wolverine because it maintains its principal place of business in Utah.

15.     Venue is proper because Bronco maintains its principal place of business in Emery, Utah and the violations alleged herein occurred in Emery, Utah, which is located in this District and Division. 28 U.S.C. § 1391(b).

## PARTIES

16.     Bronco employed Nastrom as a roof bolter and a shuttle car operator in its mine from approximately June 2021 through March 2024.

17.     Throughout his employment, Bronco subjected Nastrom to its pre/post shift off the clock policy, bonus pay scheme, and rounding policy.

18.     Bronco classified Nastrom as non-exempt and paid him by the hour.

19.     Nastrom brings this collective action on behalf of himself and similarly situated employees of Defendants'.

20.     Nastrom's written consent was filed as an exhibit to the Original Complaint in this matter. Doc. 1.

21. Nastrom's written consent for Wolverine is attached as Exhibit 1.

22. The putative FLSA collective of similarly situated employees is defined as:

> **All hourly employees who worked under Defendants' pre/post shift off the clock policy, bonus pay scheme, and/or rounding policy at any time from February 23, 2023[1] through final resolution of this action (the "Hourly Employees").**

23. Bronco is a Delaware limited liability corporation with its principal place of business in Emery, Utah.

24. Bronco may be served with process through its registered agent: **Corporation Service Company, 15 West South Temple, Suite 600, Salt Lake City, Utah 84101.**

25. Wolverine is a Delaware limited liability company with its principal place of business in Sandy, Utah.

26. Wolverine may be served with process through its registered agent: **Corporation Service Company, 15 West South Temple, Suite 600, Salt Lake City, Utah 84101.**

27. Wolverine purchased Bronco following Bronco's financial difficulties that led to the mass layoff of Hourly Employees.

28. Upon information and belief, Bronco's financial problems remain ongoing.

29. Through its acquisition of Bronco, Wolverine thereby became a successor to Bronco's business operations, including Bronco's coal mining operations.

30. And Wolverine has restarted and continued Bronco's coal mining operations.

31. Nastrom and the other Hourly Employees worked in and around Bronco's coal mining operations.

32. Nastrom and the other Hourly Employees suffered the violations alleged in this complaint, while working in Bronco's (now Wolverine's) coal mining operations.

---

[1] Nastrom filed the Original Complaint in this matter on February 23, 2026. Doc 1.

33.     As Bronco's successor, Wolverine has assumed liability for Bronco's wage and hour violations alleged herein.

34.     Wolverine, through its acquisition of Bronco, assumed responsibility, just like Bronco, for control over the terms and conditions of Bronco's operations and the Hourly Employees' employment, including control over their wages, hours, and working conditions.

35.     As Bronco's successor in interest, Wolverine and Bronco are jointly and severally liable for all wage and hour violations alleged herein.

## FLSA COVERAGE

36.     At all relevant times, Bronco and Wolverine were an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

37.     At all relevant times, Bronco and Wolverine were an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

38.     At all relevant times, Bronco and Wolverine were an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as cell phones, tools, and personal protective equipment—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

39.     At all relevant times, Bronco and Wolverine had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

40.     At all relevant times, Nastrom and the other Hourly Employees were Bronco's and Wolverine's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

41.     At all relevant times, Nastrom and the other Hourly Employees were engaged in commerce or in the production of goods for commerce.

## FACTS

5

42.     Bronco touts itself as "Utah's oldest operating coal mine" and "the leading mine to work for by creating a culture of safety and inclusion for [its] staff so that they can achieve their personal goals while producing a superior product."[2]

43.     Wolverine touts itself as "meet[ing] today's energy demand by supplying high-quality low-sulfur coal."[3]

44.     Following financial difficulties experienced by Bronco resulting in a mass layoff of Bronco employees, Wolverine purchased Bronco's assets, including its Emery coal mine, in order to continue its coal mining operations.[4]

45.     To meet their business objectives, Defendants employ workers, including Nastrom and the other Hourly Employees, to work at its Emery mine.

46.     For example, Bronco employed Nastrom as a roof bolter and a shuttle car operator from approximately June 2021 through March 2024.

47.     Nastrom's job duties included bolting in roof supports, dusting walls, hauling coal from the mine to the belt, performing machinery inspections, and ensuring ventilation was operating correctly.

48.     Nastrom's job duties likewise included donning and doffing his safety gear and protective clothing, on Bronco's premises, before and after his shifts.

49.     Throughout his employment, Nastrom recorded his "on the clock" hours using Bronco's timekeeping system.

50.     Thus, Bronco's employment records reflect the number of "on the clock" hours Nastrom recorded working each week.

---

[2] https://www.broncoutah.com/#About (last visited February 13, 2026).
[3] https://www.wolverinefuels.com/ (last visited May 27, 2026).
[4] https://www.castlecountryradio.com/2026/02/18/wolverine-fuels-to-reopen-emery-valley-mine-after-asset-purchase/(last visited May 27, 2026).

51.     Throughout his employment, Nastrom regularly worked more than 40 hours in a workweek.

52.     Nastrom typically worked approximately 10 hours a day and 5 to 6 days a week (50-60 hours a workweek) "on the clock."

53.     But throughout his employment, Bronco did not pay Nastrom for all his hours worked.

54.     Instead, Bronco subjected Nastrom to its pre/post shift off the clock policy.

55.     Specifically, Bronco required Nastrom prepare and put on protective clothing and safety gear (including hard hat, head lamp, dust mask, reflective clothing, steel toed boots, safety glasses, gloves, self-contained self-rescuer, proximity meter, gas meter, radio, tracker, and tools/tool belt) fundamentally necessary given the nature of his underground mining duties, "off the clock," on Bronco's premises, and without compensation.

56.     This took Nastrom approximately 30 minutes each workday.

57.     Nastrom could not perform his principal job duties in accordance with Bronco's policies, procedures, and expectations without this protective clothing and safety gear.

58.     Indeed, much of the gear Nastrom utilized is mandated by federal regulation. *See* 29 C.F.R. § 1910.132; 30 C.F.R. § 75, *et seq*; 30 C.F.R. § 77, *et seq*.

59.     The donning of protective clothing and safety gear was therefore an integral and indispensable work duty for Nastrom.

60.     Likewise, Bronco required Nastrom to travel out of the mine, remove and store his safety gear and protective clothing and shower after his shift, "off the clock," on Bronco's premises, and without compensation.

61.     This took Nastrom approximately 30 minutes each workday.

7

62.     Nastrom could not perform his job duties in accordance with Bronco's policies, procedures, and expectations without removing and storing this safety gear and protective clothing and showering each workday.

63.     The removal and storage of safety gear and protective clothing each day was therefore an integral and indispensable work duty for Nastrom.

64.     But under its pre/post shift off the clock policy, Bronco did not compensate him for the same.

65.     Thus, because of its pre/post shift off the clock policy, Bronco failed to pay Nastrom overtime wages for all his hours worked in excess of 40 hours in a workweek.

66.     Nastrom and the other Hourly Employees perform their jobs under Bronco's supervision and use materials, equipment, and technology Bronco approves and supplies.

67.     Bronco requires Nastrom and the other Hourly Employees to follow and abide by common work, time, pay, and overtime policies and procedures in the performance of their jobs.

68.     Nastrom's and the other Hourly Employees' work must strictly adhere to the uniform standards put in place by Bronco.

69.     At the end of each pay period, Nastrom and the other Hourly Employees receive wages from Bronco that are determined by common systems and methods that Bronco selects and controls.

70.     Like Nastrom, the other Hourly Employees typically record working approximately 50 to 60 hours a workweek "on the clock."

71.     But just as with Nastrom, Bronco fails to pay them for all their hours worked.

72.     Indeed, Bronco subjects the other Hourly Employees to the same or similar pre/post shift off the clock policy it imposed on Nastrom.

73.     Specifically, just as with Nastrom, Bronco requires the other Hourly Employees to don their protective clothing and safety gear (including hard hat, head lamp, dust mask, reflective clothing, steel toed boots, safety glasses, gloves, self-contained self-rescuer, proximity meter, gas meter, radio, tracker, and tools/tool belt) that was fundamentally necessary given the nature of their underground mining duties, all "off the clock," on its premises, and without compensation.

74.     And, like Nastrom, Bronco requires the other Hourly Employees to remove and store their safety gear and protective clothing after their shifts, "off the clock," on its premises, and without compensation.

75.     And like Nastrom, much of the gear the other Hourly Employees must utilize is mandated by federal regulation. *See* 29 C.F.R. § 1910.132; 30 C.F.R. § 75, *et seq*; 30 C.F.R. § 77, *et seq*.

76.     But, like Nastrom, the other Hourly Employees are regularly forced to perform this compensable work "off the clock" before and after their shifts.

77.     Thus, just as with Nastrom, Defendants do not pay the other Hourly Employees for this integral and indispensable work they are required to perform "off the clock" before and after their shifts.

78.     And, just as with Nastrom, these job duties take the other Hourly Employees approximately an hour each workday.

79.     In addition, Bronco subjects Nastrom and its other Hourly Employees to its rounding policy.

80.     Specifically, Bronco automatically rounds Nastrom's and its other Hourly Employees' recorded clock in and clock out times to the nearest quarter hour for Bronco's primary benefit and to the detriment of these employees.

81.     Bronco prohibits these employees from clocking in more than 7.5 minutes prior to their scheduled shifts and clocking out more than 7.5 after their scheduled shifts.

9

82.    And Bronco disciplines or threatens to discipline Nastrom and the other Hourly Employees if they clock in even a minute after their scheduled start time or prior to their scheduled end time.

83.    Bronco requires Nastrom and the other Hourly Employees to perform their regular job duties immediately whenever clocked in.

84.    Thus, under Defendant's rounding policy, Nastrom and the other Hourly Employees are denied overtime wages for overtime hours during workweeks in which they work more than 40 hours.

85.    Bronco fails to exercise its duty as the Hourly Employees' employer to ensure they are not performing work "off the clock" on its premises.

86.    And Bronco knows, should know, or recklessly disregards whether Nastrom and the other Hourly Employees routinely perform integral and indispensable work "off the clock" and without compensation, before and after their scheduled shifts, on Bronco's premises and for its primary benefit.

87.    Thus, Bronco requires, requests, suffers, or permits Nastrom and the other Hourly Employees to work "off the clock," without compensation, before and after their shifts.

88.    Despite accepting the benefits, Bronco does not pay Nastrom and the other Hourly Employees for the compensable work they perform "off the clock."

89.    Under Bronco's pre/post shift off the clock policy and rounding policy, Nastrom and the other Hourly Employees are denied overtime wages for compensable work they perform before and after their scheduled shifts, during workweeks in which they work more than 40 hours.

90.    And throughout their employment, Bronco has not paid Nastrom and the other Hourly Employees at the required premium rates for all hours worked in excess of 40 in a workweek.

91. Instead, Bronco pays Nastrom and the other Hourly Employees under its bonus pay scheme.

92. Specifically, Bronco agrees to pay and subsequently pays Nastrom and the other Hourly Employees non-discretionary bonuses, including safety bonuses, based on fulfillment of its criteria.

93. But Defendants exclude these non-discretionary bonuses from these employees' regular rates of pay for overtime purposes.

94. For example, Bronco paid Nastrom safety bonuses on an approximately quarterly basis, but excluded these bonuses from his regular rate of pay for overtime purposes during workweeks he earned the bonuses and worked in excess of 40 hours.

95. Thus, under Bronco's bonus pay scheme, Defendants do not pay Nastrom and the other Hourly Employees overtime wages at the required rates—based on all remuneration—for all hours they work in excess of 40 in a workweek.

## COLLECTIVE ACTION ALLEGATIONS

96. Nastrom brings his claims as a collective action under Section 216(b) of the FLSA on behalf of himself and the other Hourly Employees.

97. Like Nastrom, the other Hourly Employees are victimized by Defendant's pre/post shift off the clock policy, bonus pay scheme, and/or rounding policy.

98. Other Hourly Employees worked with Nastrom and indicated they were paid in the same or similar manner, performed similar work, and were subject to Defendants' same pre/post shift off the clock policy, bonus pay scheme, and/or rounding policy.

99. Based on his experience with Bronco, Nastrom is aware Defendants' pre/post shift off the clock policy, bonus pay scheme, and rounding policy were imposed on other Hourly Employees.

100.    The Hourly Employees are similarly situated in the most relevant respects.

101.    Even if their precise job duties and locations might vary, these differences do not matter for the purpose of determining their entitlement to overtime wages at the required premium rate for all overtime hours worked.

102.    Therefore, the specific job titles or job locations of the Hourly Employees do not prevent collective treatment.

103.    Rather, Defendants' pre/post shift off the clock policy, bonus pay scheme, and rounding policy render Nastrom and the other Hourly Employees similarly situated for the purpose of determining their right to overtime wages at the required rates.

104.    Defendants' records reflect the number of "on the clock" hours the Hourly Employees recorded working each week.

105.    Defendants' records show it rounded the Hourly Employees' hours to the nearest quarter hour.

106.    Defendants' records also show they paid the Hourly Employees non-discretionary bonuses.

107.    Defendants' records show it failed to include these non-discretionary bonuses in their regular rates of pay.

108.    The back wages owed to Nastrom and the other Hourly Employees can therefore be calculated using the same formula applied to the same types of records.

109.    Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Defendants' records, without detracting from the common nucleus of liability facts.

110.    Therefore, the issue of damages does not preclude collective treatment.

111. Nastrom's experiences are therefore typical of the experiences of the other Hourly Employees.

112. Nastrom has no interest contrary to, or in conflict with, the other Hourly Employees that would prevent collective treatment.

113. Nastrom has an interest in obtaining the unpaid wages owed to him and the other Hourly Employees under federal law.

114. Nastrom and his counsel will fairly and adequately protect the interests of the Hourly Employees.

115. Nastrom retained counsel with significant experience in handling complex collective action litigation.

116. Absent this collective action, many Hourly Employees will not obtain redress for their injuries, and Defendants will reap the unjust benefits of violating the FLSA.

117. Further, even if some of the Hourly Employees could afford individual litigation, it would be unduly burdensome to the judicial system.

118. Indeed, the multiplicity of actions would create hardship for the Hourly Employees, the Court, and Defendants.

119. Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

120. The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual members.

121. Among the common questions of law and fact are:

    a. Whether Defendants imposed their pre/post shift off the clock policy on the Hourly Employees;

b.    Whether Defendants' pre/post shift off the clock policy deprived the Hourly Employees of overtime compensation for overtime hours worked;

c.    Whether Defendants paid the Hourly Employees non-discretionary bonuses;

d.    Whether Defendants engaged in a policy or practice of failing to include non-discretionary bonuses in the Hourly Employees' regular rates of pay for the purpose of calculating overtime;

e.    Whether Defendants engaged in a policy and practice of automatically rounding the Hourly Employees recorded time punches to the nearest quarter hour for Bronco's primary benefit;

f.    Whether Defendants' automatic rounding policy deprived the Hourly Employees of pay for time worked at the beginning and end of their shifts;

g.    Whether Defendants failed to pay the Hourly Employees overtime wages at the required premium rates—based on all remuneration—for all overtime hours worked;

h.    Whether Defendants' decision not to pay the Hourly Employees overtime wages at the required rates—based on all remuneration—for all overtime hours worked was made in good faith; and

i.    Whether Defendants' violations were willful.

122.    There are many similarly situated Hourly Employees who have been denied overtime wages and who would benefit from the issuance of a court supervised notice of this lawsuit and the opportunity to join it.

14

123. The Hourly Employees are known to Defendants, are readily identifiable, and can be located through Defendants' business and personnel records.

### BRONCO'S VIOLATIONS WERE WILLFUL

124. Bronco knew it employed the Hourly Employees.

125. Bronco knew it was subject to the FLSA's overtime provisions.

126. Bronco knew Nastrom and the other Hourly Employees were its non-exempt employees entitled to overtime wages.

127. Bronco knew the FLSA required it to pay non-exempt employees, including Nastrom and the other Hourly Employees, overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for all hours worked over 40 in a workweek.

128. Bronco knew Nastrom and each Hourly Employee worked more than 40 hours in at least one workweek during the last 3 years because their "on the clock" hours were recorded via its timekeeping system.

129. Bronco knew it paid the Hourly Employees according to its pre/post shift off the clock policy.

130. Bronco knew it had a duty to ensure the Hourly Employees were not performing work "off the clock" (without pay).

131. Bronco knew it required the Hourly Employees to don and doff safety gear, protective clothing, gather tools and equipment, and shower "off the clock."

132. Bronco knew it controlled the Hourly Employees' work procedures.

133. Bronco knew the Hourly Employees' mandatory "off the clock" work was a fundamental requirement of their jobs with Bronco.

134. Bronco knew the Hourly Employees' mandatory "off the clock" work was an integral and indispensable requirement to their principal job duties with Bronco.

15

135.    Bronco knew the Hourly Employees routinely performed this daily, required "off the clock" work for Bronco's benefit.

136.    In other words, Bronco knew the Hourly Employees performed compensable work (*e.g.*, donning/doffing their safety gear and protective clothing) "off the clock" and without compensation.

137.    Bronco knew it automatically rounded the Hourly Employees' clock in and clock out times to the nearest quarter hour for its own primary benefit and to the detriment of the Hourly Employees.

138.    Bronco knew it paid Nastrom and the other Hourly Employees non-discretionary bonuses, including safety bonuses.

139.    Bronco knew these non-discretionary bonuses were not included in Nastrom's and the other Hourly Employees' regular rates of pay for overtime purposes.

140.    Bronco knew the FLSA required it to pay Nastrom and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 in a workweek.

141.    Bronco knew Nastrom and the other Hourly Employees regularly worked in excess of 40 hours in a workweek.

142.    Thus, Bronco knew, should have known, or recklessly disregarded whether it failed to pay Nastrom and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all the hours they worked in excess of 40 in a workweek.

143.    Bronco's failure to pay Nastrom and the other Hourly Employees overtime at the required rates—based on all remuneration—for all overtime hours worked was not reasonable, nor was this decision made in good faith.

144.    Bronco knowingly, willfully, and/or in reckless disregard of the FLSA carried out its rounding policy, bonus pay scheme, and pre/post shift off the clock policy that deprived Nastrom and the other Hourly Employees of overtime wages at the required rate of pay—based on all remuneration—for all hours worked after 40 in a workweek.

## CAUSE OF ACTION
### FAILURE TO PAY OVERTIME UNDER THE FLSA
### (FLSA COLLECTIVE)

145.    Nastrom brings his FLSA claim as a collective action on behalf of himself and the other Hourly Employees pursuant to 29 U.S.C. § 216(b).

146.    Defendants violated, and are violating, the FLSA by employing non-exempt employees, such as the Hourly Employees, in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages of at least 1.5 times their regular rates of pay—based on all remuneration—for hours in excess of 40 in a workweek.

147.    Defendants' unlawful conduct harmed the Hourly Employees by depriving them of the overtime wages they are owed.

148.    Accordingly, Defendants owe the Hourly Employees the difference between the wages actually paid and the overtime wages actually earned.

149.    Because Defendants knew or showed reckless disregard for whether its rounding policy, bonus pay scheme, and pre/post shift off the clock policy violated the FLSA, Bronco owes the Hourly Employees these wages for at least the past three years.

150.    Defendants are also liable to the Hourly Employees for an amount equal to all their unpaid overtime wages as liquidated damages.

151.    Finally, the Hourly Employees are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## JURY DEMAND

17

152.    Nastrom demands a trial by jury.

## RELIEF SOUGHT

WHEREFORE, Nastrom, individually and on behalf of the other Hourly Employees, seeks the following relief:

a.    An Order designating this lawsuit as a collective action and authorizing notice to the Hourly Employees allowing them to join this action by filing a written notice of consent;

b.    An Order finding Defendants liable to the Hourly Employees for unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

c.    Judgment awarding the Hourly Employees all unpaid wages, liquidated damages, statutory damages, and any and other penalties available under the FLSA;

d.    An Order awarding the Hourly Employees attorneys' fees, costs, and expenses;

e.    An Order awarding pre- and post-judgment interest at the highest applicable rates; and

f.    Such other and further relief as may be necessary and appropriate.

Date:   June 8, 2026

Respectfully submitted,

JOSEPHSON DUNLAP LLP


By: /s/ Alyssa J. White
Michael A. Josephson*
TX Bar No. 24014780
Andrew W. Dunlap*
TX Bar No. 24078444
Alyssa J. White (admitted pro hac vice)
TX Bar No. 24073014
JOSEPHSON DUNLAP LLP
5847 San Felipe St., Suite 2400
Houston, Texas 77057
Tel: (713) 352-1100
Fax: (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com
awhite@mybackwages.com

April L. Hollingsworth
HOLLINGSWORTH LAW OFFICE, LLC
UT Bar No. 09391
40 South 600 East
Salt Lake City, UT 84021
Tel: (801) 415-9909
Fax: (801) 303-7324
april@aprilhollingsworthlaw.com

Richard J. (Rex) Burch*
TX Bar No. 24001807
BRUCKNER BURCH PLLC
5847 San Felipe St., Suite 2400
Houston, Texas 77057
Tel: (713) 877-8788
Fax: (713) 877-8065
rburch@brucknerburch.com

*Pro hac vice applications forthcoming*

ATTORNEYS FOR NASTROM AND
THE HOURLY EMPLOYEES

19

# EXHIBIT 1

**CONFIDENTIAL FAIR LABOR STANDARDS ACT EMPLOYMENT SERVICES CONSENT**

Print Name: Christopher Nastrom

1.  I hereby consent to make a claim against Wolverine Fuels to pursue my claims of unpaid overtime during the time that I worked with the company.

2.  I designate the law firm and attorneys at JOSEPHSON DUNLAP, LLP and BRUCKNER BURCH PLLC as my attorneys to prosecute and make decisions concerning my wage claims, the manner and method of conducting this litigation, the entering of any agreements concerning settlement, attorneys' fees and costs, and all other matters pertaining to this lawsuit.

3.  I authorize the law firm and attorneys at JOSEPHSON DUNLAP, LLP and BRUCKNER BURCH PLLC to use this consent to file my claim in a separate lawsuit, class/collective action, or arbitration against Wolverine Fuels.

4.  I understand that, by filing this Consent Form, I will be bound by the Judgment of the Court or arbitrator on all issues in this case.

Signature: Christopher Nastrom (Jun 4, 2026 16:18:56 MDT)    Date Signed: Jun 4, 2026